**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | |
|---|---|
| **BRIAN FERRY** and **DAVID CLEMENT**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**CLARIENCE TECHNOLOGIES, LLC** and **SAFE FLEET HOLDINGS, LLC**,<br><br>Defendants. | Case No. 4:25-cv-00593-RK<br><br>**DEMAND FOR JURY TRIAL** |

## CONSOLIDATED CLASS ACTION COMPLAINT

Brian Ferry and David Clement ("Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this Consolidated Class Action Complaint against Defendants Clarience Technologies, LLC and Safe Fleet Holdings, LLC ("Defendants"), and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Defendants' failure to protect highly sensitive data.

2. Defendant Safe Fleet Holdings, LLC is a trucking and support services firm—and a subsidiary of Defendant Clarience Technologies, LLC.[1]

[1] *About Safe Fleet*, SAFE FLEET, https://www.safefleet.net/about/ (last visited Nov. 9, 2025).

3. As such, Defendants store a litany of highly sensitive personal identifiable information ("PII") and protected health information ("PHI")—together "PII/PHI"—about their current and former employees. But Defendants lost control over that data when cybercriminals infiltrated their insufficiently protected computer systems in a data breach (the "Data Breach").

4. It is unknown for precisely how long the cybercriminals had access to Defendants' network before the breach was discovered. In other words, Defendants had no effective means to prevent, detect, stop, or mitigate breaches of their systems—thereby allowing cybercriminals unrestricted access to their current and former employees' PII/PHI.

5. On information and belief, cybercriminals were able to breach Defendants' systems because Defendants failed to adequately train their employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII/PHI. In short, Defendants' failures placed the Class's PII/PHI in a vulnerable position—rendering them easy targets for cybercriminals.

6. Plaintiffs are Data Breach victims. They bring this class action on behalf of themselves, and all others harmed by Defendants' misconduct.

7. The exposure of one's PII/PHI to cybercriminals is a bell that cannot be unrung. Before this data breach, their current and former employees' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

**PARTIES**

8. Plaintiff, Brian Ferry, is a natural person and a citizen of Pennsylvania. He is domiciled in Pennsylvania (where he intends to remain).

9. Plaintiff, David Clement, is a natural person and a citizen of Indiana. He is domiciled in Indiana (where he intends to remain).

10. Defendant, Clarience Technologies, LLC, is a limited liability company formed under the laws of Delaware and with its principal place of business at 20600 Civic Center Dr, Southfield, Michigan 48076.

11. Defendant, Safe Fleet Holdings, LLC, is a limited liability company formed under the laws of Delaware and with its principal place of business at 6800 East 163rd Street Belton, Missouri 64012.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiffs and Defendants are citizens of different states. [2] And there are over 100 putative Class Members.

13. This Court has personal jurisdiction over Defendants because Safe Fleet Holdings, LLC is headquartered in Missouri, and both Clarience Technologies, LLC and Safe Fleet Holdings, LLC regularly conduct business in Missouri and have sufficient minimum contacts in Missouri.

14. Venue is proper in this Court because Defendants' principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

[2] Under the Class Action Fairness Act, "an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized." 28 U.S.C. § 1332(d)(10); *see also Stanfield v. Liberty Oilfield Servs. LLC*, No. 1:24-cv-00004, 2025 U.S. Dist. LEXIS 55421, at *2 (D.N.D. Mar. 25, 2025) ("[I]n the class action context, citizenship of unincorporated entities such as LLCs or LPs is determined by 'the State where it has its principal place of business and the State under whose laws it is organized.'"). Thus, Defendant Clarience Technologies, LLC is a citizen of Delaware (state of formation) and Michigan (principal place of business). And Defendant Safe Fleet Holdings, LLC is a citizen of Delaware (state of formation) and Missouri (principal place of business).

## BACKGROUND

***Defendants Collected and Stored the PII/PHI of Plaintiffs and the Class***

15. Defendant Safe Fleet Holdings, LLC is a trucking and support services firm—and a subsidiary of Defendant Clarience Technologies, LLC.[3]

16. As part of their business, Defendants receive and maintain the PII/PHI of thousands of their current and former employees.

17. In collecting and maintaining the PII/PHI, Defendants agreed they would safeguard the data in accordance with their internal policies, state law, and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII/PHI.

18. Under state and federal law, businesses like Defendants have duties to protect their current and former employees' PII/PHI and to notify them about breaches.

19. Defendants recognize these duties. For example, in the Safe Fleet "Privacy Policy," Defendants declare that:

a. "[W]e have collected the following categories of Personal Information within the last 12 months . . . Professional or employment-related information."[4]

b. "We are committed to protecting the privacy of the information you share with us, online and offline[.]"

c. "We have implemented a variety of technical, physical, and administrative measures designed to secure your Personal Information and to protect it

---

[3] *About Safe Fleet*, SAFE FLEET, https://www.safefleet.net/about/ (last visited Nov. 9, 2025).
[4] *Id.*

from accidental loss and unauthorized access, use, alteration, destruction and disclosure."[5]

20. In the Clarience Technologies "Privacy Policy," Defendants declare that:

a. "Clarience Technologies, including its direct and indirect subsidiaries ('Company'), takes the privacy and security of personal information very seriously."[6]

b. "We may use the information collected in the following ways. Specifically, we may use your . . . Education and employment information to: Arrange interviews; Consider you for employment opportunities[.][7]

c. "We understand the importance of information security and will take reasonable measures to protect the security and confidentiality of your information."[8]

21. In a promotional document titled "Why Work At Safe Fleet," Defendants advertised their cybersecurity bona fides—stating that "We're just as impressive on the software side. We have some of the largest cloud installations over any other company or industry. . . . Also consider our customers are big cities and governments – who demand the best in robust, proven and safe, data management. (Think big in cybersecurity!) And this means the technologies we use are really and truly leading edge."[9]

22. In their official "2023 Social Impact Report," Defendants advertised that:

---

[5] *Id.*
[6] *Privacy Policy*, CLARIENCE TECHNOLOGIES (Jan. 24, 2024) https://clariencetechnologies.com/privacy-policy/.
[7] *Id.*
[8] *Id.*
[9] *Why Work At Safe Fleet*, SAFE FLEET (2022) https://www.safefleet.net/documents/Why-Work-At-Safe-Fleet.pdf.

a. "Our culture and company policies target 1) prohibition of corruption and improper trade practices, 2) safeguarding data privacy and cybersecurity with responsible technology and processes[.]"[10]

b. "We are committed to protecting the privacy of personally identifiable

c. information (PII)[.]"[11]

d. "As part of this effort, Safe Fleet focuses on compliance with the legal and regulatory regimes prescribed by the California CCPA and other individual U.S. states[.]"[12]

e. "Due diligence reviews have been conducted throughout Safe Fleet to better understand and safeguard our businesses' collection, storage, transfer, and use of the PII[.]"[13]

f. "'Data privacy compliance is not limited to publishing a privacy policy that discloses company practices. It requires living up to your privacy commitments, and we aim to do just that.' – Andrew Schmolka, Sr. Vice President and Chief Legal Officer."[14]

g. "Cybersecurity and Data Security. The nature of our business dictates that we manage sensitive internal and customer-owned data."[15]

h. "In addition to our own data security teams, we leverage customer requirements and consult with third-party experts and auditors to provide a

---

[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

comprehensive data security and compliance program that is aligned with leading cyber security frameworks and standards. This enables us to identify and effectively mitigate risks related to confidentiality, integrity, and availability of company and customer data, and ensure that it remains secure and protected."[16]

i. "Managing and safeguarding this data is of critical importance to us."

j. "We conduct regular and ongoing audits, demonstrating our commitment to robust security measures and effective governance."[17]

k. "Safe Fleet offers solutions that are SOC2 reported, ISO27001 certified, and CJIS-compliant."[18]

l. "By continuously prioritizing data security, we uphold the best interests of our customers, our company, and its owners."[19]

23. On the "Safe Fleet" website, Defendants advertise "Careers" and encourage individuals to input their PII and apply for employment.[20] On the job application webpage, Defendants state "Please review our privacy practices: read privacy policy"[21] and then provide a hyperlink to a Privacy Policy that declares:

---

[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Careers*, SAFE FLEET, https://www.safefleet.net/about/careers/ (last visited Nov. 9, 2025).
[21] *SR Electrical Engineer*, SAFE FLEET, https://www.safefleet.net/about/careers/jobs/co/charlotte-nc/A4.95D/sr-electrical-engineer/all/ (last visited Nov. 9, 2025).

a. "We greatly respect your privacy, which is why we make every effort to provide a platform that would live up to the highest of user privacy standards."[22]

b. "We retain your Personal Information as per the Customer's instructions, and thereafter as needed for record-keeping matters."[23]

c. "We implement measures to secure your Personal Information."[24]

d. "We implement measures to reduce the risks of damage, loss of information and unauthorized access or use of information."[25]

24. A screenshot of the job application webpage is provided below.[26]

[22] *Privacy*, SPARK HIRE RECRUIT, https://recruit-support.sparkhire.com/hc/en-us/articles/40045103343259-Privacy-notice-for-Comeet-users (last visited Nov. 9, 2025).
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*




***Defendants' Data Breach***

25. On April 12, 2024, Defendants were hacked in the Data Breach.[27]

26. Worryingly, Defendants already admitted that:

[27] *Notice of Data Event*, NEW HAMPSHIRE ATTY GEN (July 18, 2025) https://mm.nh.gov/files/uploads/doj/remote-docs/safe-fleet-holdings-20250718.pdf.

a. “On or about April 13, 2024, Safe Fleet experienced suspicious activity in its computer systems.”[28]

b. “Safe Fleet promptly launched an investigation, with the assistance of third-party cybersecurity specialists, to determine the nature and scope of the event.”[29]

c. The investigation determined that on or before April 13, 2024, an unauthorized actor gained access to certain systems and ***accessed or took certain information***.[30]

27. Because of Defendants’ Data Breach, at least the following types of PII/PHI were compromised:

a. names;

b. addresses;

c. dates of birth;

d. Social Security numbers;

e. driver’s license numbers;

f. state identification numbers;

g. government identification numbers;

h. passport information;

i. taxpayer identification numbers;

j. financial account information;

k. payment card information;

---

[28] *Id.*
[29] *Id.*
[30] *Id.* (emphasis added).

l. usernames, email addresses, and passwords;

m. health insurance information; and

n. medical information.[31]

28. In total, Defendants injured at least 7,478 persons—via the exposure of their PII/PHI—in the Data Breach.[32] Upon information and belief, these 7,478 persons include their current and former employees.

29. And yet, Defendants waited over until July 18, 2025, before they began notifying the class—a ***full 461 days*** after the Data Breach began.[33] Such an egregious delay violates Mo. Stat. § 407.1500, 73 Pa. Stat. Ann. § 2303, and Ind. Code Ann. § 24-4.9-3-3, which require disclosure "without unreasonable delay[.]"

30. Thus, Defendants kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

31. And when Defendants did notify Plaintiffs and the Class of the Data Breach, Defendants acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning Plaintiffs and the Class:

a. "We are notifying potentially affected individuals, including you, so that you may take further steps to best protect your information[.]"[34]

---

[31] *Notice of Privacy Incident*, SAFE FLEET, https://www.safefleet.net/wp-content/uploads/Safe-Fleet-website-notice.pdf (last visited Nov. 9, 2025).
[32] *Notice of Data Event*, NEW HAMPSHIRE ATTY GEN (July 18, 2025) https://mm.nh.gov/files/uploads/doj/remote-docs/safe-fleet-holdings-20250718.pdf.
[33] *Id.*
[34] *Id.*

b. “What You Can Do. We encourage you to remain vigilant against incidents of identity theft and fraud by reviewing your account statements and credit reports for suspicious activity and to detect errors.”[35]

c. “Any suspicious activity should be promptly reported to your bank, credit card company, or other applicable institution.”[36]

d. “Consumers may further educate themselves regarding identity theft, fraud alerts, credit freezes, and the steps they can take to protect your personal information by contacting the consumer reporting bureaus, the Federal Trade Commission, or their state Attorney General.[37]

32. Defendants failed their duties when their inadequate security practices caused the Data Breach. In other words, Defendants’ negligence is evidenced by their failure to prevent the Data Breach and stop cybercriminals from accessing the PII/PHI. And thus, Defendants caused widespread injury and monetary damages.

33. Since the breach, Defendants claim that “Safe Fleet also is working to implement additional safeguards and training to its employees.”[38]

34. But such simple declarations are insufficient to ensure that Plaintiffs’ and Class Members’ PII/PHI will be protected from additional exposure in a subsequent data breach.

35. Further, the Notice of Data Breach shows that Defendants cannot—or will not—determine the full scope of the Data Breach, as Defendants has been unable to determine precisely what information was stolen and when.

---

[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*

36. Defendants have done little to remedy their Data Breach. True, Defendants has offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiffs and Class Members for the injuries that Defendants inflicted upon them.

37. Because of Defendants' Data Breach, the sensitive PII/PHI of Plaintiffs and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiffs and Class Members.

***Plaintiff Brian Ferry's Experiences and Injuries***

38. Plaintiff Brian Ferry is a former employee of Defendants.

39. Thus, Defendants obtained and maintained Plaintiff's PII/PHI.

40. As a result, Plaintiff was injured by Defendants' Data Breach.

41. Plaintiff is very careful about the privacy and security of his PII/PHI. He does not knowingly transmit his PII/PHI over the internet in an unsafe manner. He is careful to store any documents containing his PII/PHI in a secure location.

42. As a condition of his employment with Defendant, Plaintiff provided Defendants with his PII/PHI. Defendants used that PII/PHI to facilitate their employment of Plaintiff, including payroll, and required Plaintiff to provide that PII/PHI in order to obtain employment and payment for that employment.

43. Plaintiff provided his PII/PHI to Defendants and trusted they would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continues to maintain Plaintiff's PII/PHI and has a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

44. Plaintiff reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of PII/PHI.

45. Plaintiff received a Notice of Data Breach dated July 18, 2025.

46. Thus, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

47. Through their Data Breach, Defendants compromised Plaintiff's PII/PHI.

48. In or around February 2025, Plaintiff suffered from the misuse of his PII/PHI when cybercriminals placed a fraudulent charge on his financial account.

49. In response to the fraud, Plaintiff spent time placing a "lock" on his credit and then paid approximately $20 per month for credit monitoring services with Experian. Thus, Plaintiff incurred unreimbursed out-of-pocket monetary losses.

50. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendants directed Plaintiff to take those steps in their breach notice.

51. And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam emails, text messages and phone calls.

52. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

53. Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

54. Plaintiff suffered actual injury from the exposure and theft of his PII/PHI—which violates his rights to privacy.

55. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendants were required to adequately protect.

56. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII/PHI right in the hands of criminals.

57. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

58. Today, Plaintiff has a continuing interest in ensuring that his PII/PHI—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Plaintiff David Clement's Experiences and Injuries***

59. Plaintiff David Clement is a former employee of Defendants.

60. Thus, Defendants obtained and maintained Plaintiff's PII/PHI.

61. As a result, Plaintiff was injured by Defendants' Data Breach.

62. Plaintiff is very careful about the privacy and security of his PII/PHI. He does not knowingly transmit his PII/PHI over the internet in an unsafe manner. He is careful to store any documents containing his PII/PHI in a secure location.

63. As a condition of his employment with Defendant, Plaintiff provided Defendants with his PII/PHI. Defendants used that PII/PHI to facilitate their employment of Plaintiff, including

payroll, and required Plaintiff to provide that PII/PHI in order to obtain employment and payment for that employment.

64. Plaintiff provided his PII/PHI to Defendants and trusted they would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continues to maintain Plaintiff's PII/PHI and have a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

65. Plaintiff reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of PII/PHI.

66. Plaintiff received a Notice of Data Breach on or around July 18, 2025.

67. Thus, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web. Confirming this belief, Plaintiff has received notifications telling him his information has been compromised on the Dark Web. Plaintiff is very concerned about the extent and long term effects of this disclosure.

68. Through their Data Breach, Defendants compromised Plaintiff's PII/PHI.

69. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendants directed Plaintiff to take those steps in their breach notice.

70. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

71. Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

72. Plaintiff suffered actual injury from the exposure and theft of his PII/PHI—which violates his rights to privacy.

73. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendants were required to adequately protect.

74. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII/PHI right in the hands of criminals.

75. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

76. Today, Plaintiff has a continuing interest in ensuring that his PII/PHI—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

77. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[39] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer

[39] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).

respondents saying they won't purchase from an organization they don't trust with their data."[40]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[41]

c. 89% of consumers stated that "I care about data privacy."[42]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[43]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[44]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[45]

***Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft***

78. Because of Defendants' failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their PII/PHI is used;

b. diminution in value of their PII/PHI;

---

[40] *Id*. at 3.
[41] *Id*.
[42] *Id*. at 9.
[43] *Id*.
[44] *Id*.
[45] *Id*. at 11.

c. compromise and continuing publication of their PII/PHI;

d. out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen PII/PHI; and

h. continued risk to their PII/PHI—which remains in Defendants' possession—and is thus as risk for futures breaches so long as Defendants fails to take appropriate measures to protect the PII/PHI.

79. Stolen PII/PHI is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII/PHI can be worth up to $1,000.00 depending on the type of information obtained.

80. The value of Plaintiffs and Class's PII/PHI on the black market is considerable. Stolen PII/PHI trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

81. It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII/PHI far and wide.

82. One way that criminals profit from stolen PII/PHI is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data—

first the stolen PII/PHI, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

83. The development of "Fullz" packages means that the PII/PHI exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet.

84. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII/PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members' stolen PII/PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

85. Defendants disclosed the PII/PHI of Plaintiffs and Class Members for criminals to use in the conduct of criminal activity. Specifically, Defendants opened up, disclosed, and exposed the PII/PHI of Plaintiffs and Class Members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII/PHI.

86. Defendants' failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII/PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendants Knew—Or Should Have Known—of the Risk of a Data Breach***

87. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

88. In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[46]

89. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[47]

90. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendant.

***Defendants Failed to Follow FTC Guidelines***

91. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

---

[46] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[47] Ben Kochman, *FBI*, *Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

92. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[48] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

93. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

94. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

95. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15

[48] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

96. In short, Defendants' failure to use reasonable and appropriate measures to protect against unauthorized access to their current and former employees' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendants Failed to Follow Industry Standards***

97. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendants. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

98. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

99. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

100. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

***Defendants Violated HIPAA***

101. HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[49]

102. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII/PHI and PHI is properly maintained.[50]

103. The Data Breach itself resulted from a combination of inadequacies showing Defendants failed to comply with safeguards mandated by HIPAA. Defendants' security failures include, but are not limited to:

a. failing to ensure the confidentiality and integrity of electronic PHI that they creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

[49] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[50] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

b. failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. failing to ensure compliance with HIPAA security standards by Defendants' workforce in violation of 45 C.F.R. § 164.306(a)(4);

e. failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g. failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

104. Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations.

## CLASS ACTION ALLEGATIONS

105. Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII/PHI was compromised in the Data Breach discovered by Safe Fleet Holdings, LLC in April 2024, including all those individuals who received notice of the breach.

106. Excluded from the Class are Defendants, their agents, affiliates, parents, subsidiaries, any entity in which Defendants have a controlling interest, any of Defendants' officers or directors, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

107. Plaintiffs reserve the right to amend the class definition.

108. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of his claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

109. <u>Ascertainability</u>. All members of the proposed Class are readily ascertainable from information in Defendants' custody and control. After all, Defendants already identified some individuals and sent them data breach notices.

110. <u>Numerosity</u>. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 7,478 members.

111. Typicality. Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendants, and the same unreasonable manner of notifying individuals about the Data Breach.

112. Adequacy. Plaintiffs will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class Members' interests. And Plaintiffs have retained counsel—including lead counsel—that are experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

113. Commonality and Predominance. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendants had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII/PHI;

b. if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendants were negligent in maintaining, protecting, and securing PII/PHI;

d. if Defendants breached contract promises to safeguard Plaintiffs and the Class's PII/PHI;

e. if Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendants' Breach Notice was reasonable;

g. if the Data Breach caused Plaintiffs and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiffs and the Class are entitled to damages, treble damages, and or injunctive relief.

114. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendants would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

115. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

116. Plaintiffs and the Class entrusted their PII/PHI to Defendants on the premise and with the understanding that Defendants would safeguard their PII/PHI, use their PII/PHI for business purposes only, and/or not disclose their PII/PHI to unauthorized third parties.

117. Defendants owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendants' failure—to use adequate data security in accordance with industry

standards for data security—would compromise their PII/PHI in a data breach. And here, that foreseeable danger came to pass.

118. Defendants had full knowledge of the sensitivity of the PII/PHI and the types of harm that Plaintiffs and the Class could and would suffer if their PII/PHI was wrongfully disclosed.

119. Defendants owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security practices. After all, Defendants actively sought and obtained Plaintiffs and Class Members' PII/PHI.

120. Defendants owed—to Plaintiffs and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the PII/PHI in their care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their PII/PHI.

121. Thus, Defendants owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII/PHI, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

122. Defendants also had a duty to exercise appropriate clearinghouse practices to remove PII/PHI they were no longer required to retain under applicable regulations.

123. Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII/PHI of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

124. Defendants' duty to use reasonable security measures arose because of the special relationship that existed between Defendants and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class entrusted Defendants with their confidential PII/PHI, a necessary part of obtaining services from Defendants.

125. The risk that unauthorized persons would attempt to gain access to the PII/PHI and misuse it was foreseeable. Given that Defendants hold vast amounts of PII/PHI, it was inevitable that unauthorized individuals would attempt to access Defendants' databases containing the PII/PHI —whether by malware or otherwise.

126. PII/PHI is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII/PHI of Plaintiffs and Class Members' and the importance of exercising reasonable care in handling it.

127. Defendants improperly and inadequately safeguarded the PII/PHI of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

128. Defendants breached these duties as evidenced by the Data Breach.

129. Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII/PHI by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the PII/PHI was stored, used, and exchanged, and those in their employ who were responsible for making that happen.

130. Defendants breached their duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII/PHI of Plaintiffs and Class Members which actually and proximately caused the Data Breach and Plaintiffs and Class Members' injury.

131. Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

132. Defendants have admitted that the PII/PHI of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

133. As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

134. And, on information and belief, Plaintiffs' PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

135. Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII/PHI by

criminals, improper disclosure of their PII/PHI, lost benefit of their bargain, lost value of their PII/PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**Negligence *per se***
**(On Behalf of Plaintiffs and the Class)**

136. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

137. Under the FTC Act, 15 U.S.C. § 45, Defendants had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII/PHI.

138. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII/PHI entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiffs and the Class Members' sensitive PII/PHI.

139. Defendants breached their respective duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII/PHI.

140. Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII/PHI and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

141. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

142. But for Defendants' wrongful and negligent breach of their duties owed, Plaintiffs and Class Members would not have been injured.

143. The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that Defendants were failing to meet their duties and that their breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PII/PHI.

144. Similarly, under HIPAA, Defendants had a duty to follow HIPAA standards for privacy and security practices—as to protect Plaintiffs' and Class Members' PHI.

145. Defendants violated their duty under HIPAA by failing to use reasonable measures to protect their PHI and by not complying with applicable regulations detailed *supra*. Here too, Defendants' conduct was particularly unreasonable given the nature and amount of PHI that Defendants collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

146. Additionally, Defendants waited over until July 18, 2025, before they began notifying the class—a ***full 461 days*** after the Data Breach began. Such an egregious delay violates Mo. Stat. § 407.1500, 73 Pa. Stat. Ann. § 2303, and Ind. Code Ann. § 24-4.9-3-3, which require disclosure "without unreasonable delay[.]"

147. Defendants' various violations and their failure to comply with applicable laws and regulations constitutes negligence *per se*.

148. As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**<u>THIRD CAUSE OF ACTION</u>**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

149. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

150. Plaintiffs and Class Members were required to provide their PII/PHI to Defendants as a condition of receiving employment provided by Defendants. Plaintiffs and Class Members provided their PII/PHI to Defendants or their third-party agents in exchange for Defendants' employment.

151. Plaintiffs and Class Members reasonably understood that a portion of the funds derived from their labor would be used to pay for adequate cybersecurity measures.

152. Plaintiffs and Class Members reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

153. Plaintiffs and the Class Members accepted Defendants' offers by disclosing their PII/PHI to Defendants or their third-party agents in exchange for employment.

154. In turn, and through internal policies, Defendants agreed to protect and not disclose the PII/PHI to unauthorized persons.

155. In their Privacy Policy, Defendants represented that they had a legal duty to protect Plaintiffs' and Class Member's PII/PHI.

156. Implicit in the parties' agreement was that Defendants would provide Plaintiffs and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their PII/PHI.

157. After all, Plaintiffs and Class Members would not have entrusted their PII/PHI to Defendants in the absence of such an agreement with Defendants.

158. Plaintiffs and the Class fully performed their obligations under the implied contracts with Defendant.

159. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

160. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

161. Defendants materially breached the contracts they entered with Plaintiffs and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into their computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic PII/PHI that Defendants created, received, maintained, and transmitted.

162. In these and other ways, Defendants violated their duty of good faith and fair dealing.

163. Defendants' material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

164. And, on information and belief, Plaintiffs' PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

165. Plaintiffs and Class Members performed as required under the relevant agreements, or such performance was waived by Defendants' conduct.

**FOURTH CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Class)**

166. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

167. Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII/PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

168. Defendants owed a duty to their current and former employees, including Plaintiffs and the Class, to keep this information confidential.

169. The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs and Class Members' PII/PHI is highly offensive to a reasonable person.

170. The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class disclosed their sensitive and confidential information to Defendants, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

171. The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

172. By intentionally failing to keep Plaintiffs' and Class Members' PII and PHI safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendants intentionally invaded Plaintiffs' and Class Members' privacy by:

a. Intentionally and substantially intruding into Plaintiffs' and Class Members' private affairs in a manner that identifies Plaintiffs and Class Members and that would be highly offensive and objectionable to an ordinary person;

b. Intentionally publicizing private facts about Plaintiffs and Class Members, which is highly offensive and objectionable to an ordinary person; and

c. Intentionally causing anguish or suffering to Plaintiffs and Class Members.

173. As the Restatement explains, as used throughout the Restatement of Torts, intent "has reference to the consequences of an act rather than the act itself." Restatement (Second) of Torts § 8A, cmt. A (1964). "Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act,

and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." *Id.* cmt. B.

174. Indeed, given the foreseeability of the harms inherent in data breaches and the ubiquitous nature of data breaches, Defendants were substantially certain that their failure to implement reasonable cybersecurity standards would lead to an invasion of Plaintiffs' privacy.

175. Defendants knew that an ordinary person in Plaintiffs' or Class Members' position would consider the exposure of their PII and PHI to be highly offensive and objectionable.

176. Defendants invaded Plaintiffs' and Class Members' right to privacy and intruded into Plaintiffs' and Class Members 'private affairs by intentionally misusing and/or disclosing their PII and PHI without their informed, voluntary, affirmative, and clear consent.

177. Moreover, given that stolen PII and PHI is then publicized and traded on the dark web and through Telegram channels, Defendants knew or were substantially certain that their failure to implement reasonable cybersecurity safeguards would lead to the publication of Plaintiffs' and the Class Members' PII and PHI to a large group of the public and/or to a large group of individuals who are in a special relationship with Plaintiffs' and the proposed Class Members, in that those individuals are exactly the type of people that Plaintiffs' and the Class Members have a special interest in ensuring their PII and PHI is kept confidential from given that those individuals are known identity thieves and fraudsters.

178. As a proximate result of Defendants' acts and omissions, the private and sensitive PII/PHI of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages (as detailed *supra*).

179. And, on information and belief, Plaintiffs' PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

180. Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII/PHI are still maintained by Defendants with their inadequate cybersecurity system and policies.

181. Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the PII/PHI of Plaintiffs and the Class.

182. In addition to injunctive relief, Plaintiffs, on behalf of himself and the other Class Members, also seek compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

183. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

184. This claim is pleaded in the alternative to the breach of implied contract claim.

185. Plaintiffs and Class Members conferred a benefit upon Defendant. After all, Defendants benefitted from (1) using their PII/PHI to facilitate employment, and (2) using their labor to derive profit.

186. Defendants appreciated or had knowledge of the benefits they received from Plaintiffs and Class Members.

187. Plaintiffs and Class Members reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendants' duties under state and federal law and its internal policies.

188. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII/PHI.

189. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

190. Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) PII/PHI and (2) employment because Defendants failed to adequately protect their PII/PHI.

191. Plaintiffs and Class Members have no adequate remedy at law.

192. Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that they received because of their misconduct.

## SIXTH CAUSE OF ACTION
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the Class)**

193. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

194. Given the relationship between Defendants and Plaintiffs and Class Members, where Defendants became guardian of Plaintiffs' and Class Members' PII/PHI, Defendants became a fiduciary by its undertaking and guardianship of the PII/PHI, to act primarily for

Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs and Class Members' PII/PHI; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and does store.

195. Defendants has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendants' relationship with them—especially to secure their PII/PHI.

196. Because of the highly sensitive nature of the PII/PHI, Plaintiffs and Class Members would not have entrusted Defendant, or anyone in Defendants' position, to retain their PII/PHI had they known the reality of Defendants' inadequate data security practices.

197. Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiffs' and Class Members' PII/PHI.

198. Defendants also breached their fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

199. As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**SEVENTH CAUSE OF ACTION**
**Declaratory Judgment**
**(On Behalf of Plaintiffs and the Class)**

200. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

201. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant

further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

202. In the fallout of the Data Breach, an actual controversy has arisen about Defendants' various duties to use reasonable data security. On information and belief, Plaintiffs allege that Defendants' actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

203. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owed—and continue to owe—a legal duty to use reasonable data security to secure the data entrusted to them;

b. Defendants have a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendants breached, and continue to breach, its duties by failing to use reasonable measures to the data entrusted to them; and

d. Defendants' breaches of their duties caused—and continue to cause—injuries to Plaintiffs and Class Members.

204. The Court should also issue corresponding injunctive relief requiring Defendants to use adequate security consistent with industry standards to protect the data entrusted to them.

205. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendants experience a second data breach.

206. And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—

while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs and Class Members' injuries.

207. If an injunction is not issued, the resulting hardship to Plaintiffs and Class Members far exceeds the minimal hardship that Defendants could experience if an injunction is issued.

208. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

**PRAYER FOR RELIEF**

Plaintiffs and Class Members respectfully request judgment against Defendants and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representative, and appointing their counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D. Awarding Plaintiffs and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E. Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial for all claims so triable.

Dated: November 14, 2025

By: */s/ Raina C. Borrelli*

Raina C. Borrelli (*pro hac vice*)
Samuel J. Strauss (*pro hac vice*)
STRAUSS BORRELLI PLLC
One Magnificent Mile
980 N Michigan Avenue, Suite 1610
Chicago IL, 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com
sam@straussborrelli.com

Leigh S. Montgomery*
Texas Bar No. 24052214
lmontgomery@eksm.com
EKSM, LLP
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Phone: (888) 350-3931
Fax: (888) 276-3455

*Attorneys for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I, Raina C. Borrelli, hereby certify that on November 14, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record via the ECF system.

DATED this 14th day of November, 2025.

STRAUSS BORRELLI PLLC

By: */s/ Raina C. Borrelli*

Raina C. Borrelli
raina@straussborrelli.com
STRAUSS BORRELLI PLLC
One Magnificent Mile
980 N Michigan Avenue, Suite 1610
Chicago IL, 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109